In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3454

United States of America,

Plaintiff-Appellee,

v.

William A. Sonsalla,

Defendant-Appellant.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:00CR00025-001--John C. Shabaz, Chief Judge.


Argued January 30, 2001--Decided March 1, 2001


	Before Flaum, Chief Judge, and Ripple and Rovner,
Circuit Judges.

	Flaum, Chief Judge.  William Sonsalla pleaded
guilty pursuant to a written plea agreement to
one count of making false entries in bank records
in violation of 18 U.S.C. sec. 1005. The district
court sentenced him to 18 months in prison
followed by five years of supervised release, and
ordered him to pay $142,083.69 in restitution.
Sonsalla appeals his sentence, arguing that the
record fails to support the district court's
imposition of upward adjustments to his base
offense level for "more than minimal planning,"
U.S.S.G. sec. 2F1.1(b)(2)(A), and for "abuse of
a position of trust," U.S.S.G. sec. 3B1.3.
Because the record contains more than adequate
factual support for each of the adjustments, we
affirm Sonsalla's sentence.

I.  BACKGROUND

	The People's State Bank of Augusta, Wisconsin
hired Sonsalla in July 1981 to oversee commercial
and real estate loans and serve as the bank's
compliance officer. During his last 12 years of
employment at the bank, Sonsalla was a Vice-
President and was responsible for loans,
delinquent loans, personnel and payroll. As Vice-
President, he also supervised three loan officers
and hired and fired the bank's tellers.

In April 1988, Sonsalla began embezzling money from the bank. Drawing from his understanding of the banking system and his knowledge that the bank's "Achilles' heel" was its lax oversight of money orders, Sonsalla concocted a scheme of issuing money orders from customer accounts without authorization and misappropriating cash entrusted to him by customers for deposit in order to purchase money orders for his own personal use. By issuing the money orders to his credit card company, Sonsalla concealed the fact that he was the actual recipient of customers' funds. He targeted, in particular, customers who had demonstrated their elevated trust in him by personally giving him cash to deposit, as well as accounts exhibiting greater activity or a more substantial cash "float."

The bank's Board of Directors began to suspect Sonsalla's misconduct upon discovering, in January 1997, that some of his loan file documentation was missing. In April 1997, the Board gave Sonsalla 60 days to straighten out his loan files; he failed to comply and in August, the Board placed him on administrative leave. In the meantime, Tom McHugh, one of Sonsalla's customers, contacted the bank regarding a large discrepancy in his outstanding loan balance. In response, the bank hired an outside auditor to conduct a complete audit. The auditors uncovered $70,511 in money orders that Sonsalla had prepared and charged to various customers' accounts, $71,589 in cash he received from customers but had not applied to their loans or deposit accounts as directed, and an unauthorized $10,000 transfer between customer accounts. Except for a $5,000 deductible, the bank's losses were covered by its insurer, Kansas Bankers Surety.

His scheme revealed, Sonsalla admitted to the bank's President in September 1997 that he had been taking money from Mr. McHugh's account to cover up his mistakes and for his own personal use. Sonsalla maintained, however, that Mr. McHugh's was the only account from which he had taken money. Nevertheless, the bank then terminated his employment.

In March 2000, a federal grand jury returned an indictment charging Sonsalla with one count of embezzlement under 18 U.S.C. sec. 656 (Count I), and one count of making false entries in the records of People's State Bank with the intent to deceive under 18 U.S.C. sec. 1005 (Count II). Count II specifically charged that on October 24, 1995, Sonsalla caused a $25,000 advance to issue from a customer's loan account without authorization, which he used to purchase a $25,000 money order. Count II further charged that Sonsalla then deposited the $25,000 into

another customer's account from which he had previously made an unauthorized withdrawal. Pursuant to a written agreement, Sonsalla pleaded guilty to Count II in exchange for the government's dismissal of Count I.

Adopting the calculations in the Presentence Investigation Report ("PSR"), the district court calculated the loss caused by Sonsalla's crime as being between $120,000 and $200,000, and therefore increased Sonsalla's base offense level by seven, in accordance with U.S.S.G. sec. 2F1.1(b)(1)(H). Over Sonsalla's objection, the court also imposed a two-level upward adjustment for "more than minimal planning," U.S.S.G. sec. 2F1.1(b)(2)(A). The district court accepted this recommendation based on its view that Sonsalla's "hundreds of transactions" over a period of more than eight years were not "purely opportune." Additionally, the district court found that Sonsalla committed "a very severe abuse of trust" and "used his sensitive position as a bank officer" to perpetrate and conceal a fraud, and thus imposed a two-level upward adjustment for abuse of trust under U.S.S.G. sec. 3B1.3. After reducing the offense level by three for acceptance of responsibility, the district court imposed a sentence of 18 months in prison--the middle of the guideline range--and ordered restitution of $142,083.69.

II.  DISCUSSION
A.  More Than Minimal Planning

Section 2F1.1(b)(2)(A) permits a sentencing court to increase the defendant's offense level by two upon a finding that he or she engaged in "more than minimal planning." Applying the definition of more than minimal planning in the commentary to sec. 1B1.1, this court has explained that this upward adjustment is appropriate where: (1) there is more planning than is typical for commission of the offense in simple form; (2) steps are taken to conceal the offense; or (3) criminal acts, each of which are not purely opportune, are repeated over a period of time. United States v. Brown, 47 F.3d 198, 204 (7th Cir. 1995); see U.S.S.G. sec. 1B1.1 commentary at 1(f). This court reviews for clear error the district court's determination that a defendant engaged in more than minimal planning. See United States v. Mau, 45 F.3d 212, 214 (7th Cir. 1995).

By itself, the district court's determination that Sonsalla's repeated acts over an eight-year period constituted more than minimal planning is sufficient to support the upward adjustment under sec. 2F1.1(b)(2)(A). See United States v. Boatner, 99 F.3d 831, 838 (7th Cir. 1996). The

district court was permitted to adopt the facts in the PSR, whose accuracy and reliability Sonsalla did not contest, as support for its findings and conclusions. See United States v. Krankel, 164 F.3d 1046, 1055 (7th Cir. 1998). Furthermore, the court was within its authority to rely on the PSR alone in finding that Sonsalla's acts were not purely opportune but rather constituted evidence of more than minimal planning. See United States v. Mustread, 42 F.3d 1097, 1101-02 (7th Cir. 1994). The PSR describes in detail Sonsalla's embezzlement scheme, involving hundreds of transactions, generally in $2,000 to $3,000 increments, into and out of ten bank accounts over more than eight years. Although Sonsalla initially embezzled money approximately once every six months, as he continued his scheme undetected, he increased the frequency and amount of his takings. In addition, he preyed on customers whose accounts he knew had more activity or a greater cash "float." Thus, because he utilized his knowledge of bank operations to shape the pattern, frequency and amounts of his illegal transactions, Sonsalla's acts were not "purely opportune," but instead deliberate and calculated to maximize his deception. Cf. United States v. Green, 114 F.3d 613, 619 (7th Cir. 1997) (15 visits made to physicians after staged accidents were calculated to conceal insurance fraud and were not purely opportune); Mau, 45 F.3d at 214 (volume and amount of checks and defendant's business expertise demonstrated that check kiting was not purely opportune); United States v. Ojo, 916 F.2d 388, 391-92 (7th Cir. 1990) (repeatedly obtaining numerous forms of false identification demonstrated significant forethought and planning such that acts were not purely opportune). Sonsalla's repeated acts were "one consistent way of carrying out a fraudulent plan," Green, 114 F.3d at 619, and thus the upward adjustment for more than minimal planning was appropriate.

We note additionally that the upward adjustment would have been proper under the first and second factors set forth in Brown, 47 F.3d at 204. Sonsalla took steps to conceal his scheme by designating his credit card company as payee of the money orders, transferring funds into and out of customers' accounts, and falsifying or omitting information from the bank's books and records. When confronted by the bank's President about his conduct, he misrepresented that Mr. McHugh's account was the only account from which he had stolen, when in fact his scheme involved ten different accounts. In addition, his success in perpetuating his scheme unabated for over eight years demonstrates that his offense involved more planning than is typical for the simple act of doctoring a bank's books and

records. See Boatner, 99 F.3d at 838 (elaborate insurance fraud scheme underlying mail fraud offense constituted more planning than is typical for simple mail fraud). Accordingly, the record contains more than adequate support for the district court's conclusion that Sonsalla engaged in more than minimal planning of his offense.

## B. Abuse of Position of Trust

Section 3B1.3 of the Sentencing Guidelines permits a two-level upward adjustment "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." The sentencing court may not apply this adjustment, however, when abuse of trust is a necessary element of the offense of conviction. United States v. Sinclair, 74 F.3d 753, 763 (7th Cir. 1996) (sec. 3B1.3 increase was proper because base offense level for solicitation or acceptance of bribes did not take into account abuse of trust). This court reviews de novo the sentencing court's interpretation of the meaning of "position of trust," see United States v. Hernandez, 231 F.3d 1087, 1089 (7th Cir. 2000), but reviews only for clear error the court's factual finding that a defendant occupied and abused a position of trust to facilitate his offense, see United States v. Bailey, 227 F.3d 792, 801 (7th Cir. 2000).

## 1. Double-Counting

Sonsalla first argues that the offense of falsifying bank records, 18 U.S.C. sec. 1005, necessarily involves an abuse of trust in every case, and therefore it was double-counting to increase his offense level under sec. 3B1.3. Although this is a question of first impression in this circuit, other circuits have upheld the application of sec. 3B1.3 to defendants convicted under sec. 1005. See United States v. McCord, 33 F.3d 1434, 1453 (5th Cir. 1994) (application of sec. 3B1.3 to defendant convicted under sec. 1005 was not clearly erroneous); United States v. Pooler, 961 F.2d 1354, 1357 (8th Cir. 1992) (same); cf. United States v. Ragland, 72 F.3d 500, 502-03 (6th Cir. 1996) (sec. 3B1.3 applicable to sec. 1005 offenders, but record failed to demonstrate that defendant held position of trust).

This court has explained that, although breach of trust is a necessary element of embezzlement under 18 U.S.C. sec. 656--a statute parallel to sec. 1005 prohibiting "misappropriation" of bank funds with the intent to deceive--abuse of trust is not, and constitutes more egregious conduct warranting an upward adjustment under sec. 3B1.3.

See United States v. Dion, 32 F.3d 1147, 1149-50 (7th Cir. 1994) (joining Second, Third, Fifth and Ninth Circuits in holding that abuse of position of trust is not an element of embezzlement under sec. 656); United States v. Hathcoat, 30 F.3d 913, 918-19 (7th Cir. 1994); cf. Moore v. United States, 160 U.S. 268, 269 (1895) (explaining that embezzlement, by definition, requires finding of breach of trust). In holding that an embezzler could qualify, upon a proper factual showing, for a sec. 3B1.3 adjustment, the Hathcoat court looked to the commentary to sec. 3B1.3, which explains that an individual who holds a position of public or private trust has "professional or managerial discretion" and is subject to "significantly less supervision" than employees with non-discretionary responsibilities. U.S.S.G. sec. 3B1.3 commentary at 1. Indeed, the commentary lists a bank executive's fraudulent loan scheme as one situation in which the increase for abuse of trust would be proper. See id.

Although conviction under sec. 1005 requires proof of an element (a false entry in bank records) not necessary to sec. 656, see United States v. Marquardt, 786 F.2d 771, 778-79 (7th Cir. 1986), the two offenses are similar insofar as a breach of trust owed by the employee or officer is sufficient to constitute a violation of either statute; an abuse of trust is not required. Cf. Ragland, 72 F.3d at 502-03 (defendant convicted of violating sec. 1005 did not abuse position of trust and therefore did not qualify for sec. 3B1.3 adjustment). Additionally, allowing the upward adjustment in sec. 1005 cases promotes the guideline's stated purpose of "punish[ing] more severely those defendants whose crimes are more difficult to detect by virtue of the special nature of their positions." Hathcoat, 30 F.3d at 920 (Eschbach, J., dissenting). Therefore, just as the court "categorically" rejected the double-counting argument with respect to sec. 656, Dion, 32 F.3d at 1149, we now reject Sonsalla's double-counting argument with respect to sec. 1005. Thus, we hold that because abuse of a position of trust is not an element of falsification of bank records under sec. 1005, upon an appropriate factual showing a defendant convicted under sec. 1005 may qualify for an increase in offense level under sec. 3B1.3.

2. Sonsalla's Abuse of His Position of Trust Significantly Facilitated His Offense

In order for Section 3B1.3 to apply, the district court must find that: (1) the defendant occupied a position of trust, and (2) the defendant's abuse of that position of trust

significantly facilitated the commission of the crime. United States v. Stewart, 33 F.3d 764, 768 (7th Cir. 1994); see U.S.S.G. sec. 3B1.3 commentary at 1.

Contrary to Sonsalla's argument, the district court did not rely solely on his title of Vice-President in determining that he held a position of trust at the bank. Rather, the responsibilities and privileges that characterized his position were the key to his knowledge of the banking system and the operations of the bank. In addition, as Vice-President, he oversaw commercial and real estate loans and acted as compliance officer. Thus, regardless of his title, Sonsalla's actual duties involved substantial discretion and responsibility, and the record amply supports the district court's finding that Sonsalla occupied a position of trust. Cf. Hernandez, 231 F.3d at 1091 (staff accountant who had access to corporate funds, autonomy in preparing check requests and minimal supervision occupied position of trust); Dion, 32 F.3d at 1150 (installment loan officer occupied position of trust).

The record also supports the district court's finding that Sonsalla would not have been able to execute his fraudulent scheme had he not occupied such a "sensitive position" with the bank. His position allowed him access to large amounts of cash, including funds customers had given him personally to deposit into their accounts. Cf. United States v. Christiansen, 958 F.2d 285, 288 (9th Cir. 1992) (defendant's position as bank branch representative gave her access to large amounts of cash). Utilizing the knowledge gained through his position and lengthy experience at the bank, Sonsalla was able to exploit the bank's weaknesses, including its lax oversight of money orders. Furthermore, because of his role as the bank's compliance officer, no one else was looking over his shoulder to ensure that his loan documentation and customer accounts were in order, thus allowing him to commit and conceal his crime for many years. Had someone else been acting as compliance officer, Sonsalla's files would have been reviewed and found to be in disarray years earlier. Instead, it was not until McHugh's inquiry about his loan account that the bank initiated the audit that revealed his fraudulent scheme. Cf. Dion, 32 F.3d at 1150 (because of position at bank, defendant was able to misapply funds and conceal their location by recharacterizing transactions); Stewart, 33 F.3d at 769 (defendant, a licensed insurance broker, mailed communications to clients and others containing false representations that concealed his conversion of clients' funds); Christiansen,

958 F.2d at 288 (defendant's position allowed her to conceal theft for extended period of time). In light of all of the above, the district court's finding that Mr. Sonsalla's abuse of his position of trust significantly facilitated his offense was not clearly erroneous.

III.   CONCLUSION

The district court's findings that Sonsalla engaged in more than minimal planning, and that his abuse of his position of trust significantly facilitated his offense were not clearly erroneous. Therefore, the two-level upward adjustments under sec. 2F1.1.(b)(2)(A) and sec. 3B1.3 were proper. For the foregoing reasons, we Affirm the decision of the district court.