**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rao CHANNAPRAGADA,**
**Defendant–Appellant.**

No. 94–3974.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1995.

Decided July 6, 1995.

Lawrence Beaumont, Office of the U.S. Atty., Urbana Div., Urbana, IL (argued), for plaintiff-appellee.

James R. Ferguson, Sonnenschein, Nath & Rosenthal, Chicago, IL (argued), for defendant-appellant.

Before POSNER, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Defendant Rao Channapragada was convicted by a jury of violations of 18 U.S.C. § 495 and § 1001 for making fraudulent and

false statements, and for counterfeiting and forgery. The district court sentenced him to fifteen months in prison. Channapragada now challenges his sentence, arguing that the district court erred in adding six levels for the amount of loss and two levels for more than minimal planning. We affirm.

## I.

Rao Channapragada was president of Memory Storage Devices, Inc. ("MSD"), a subsidiary of Media Technology International, Inc. ("MTI"). In the fall of 1988, Channapragada approached the Champaign County Regional Planning Commission (the "Commission") and began negotiating for financial assistance for MSD in the form of operating capital to build a CD Rom factory in Champaign, Illinois. Channapragada discussed this plan with John Dimit, Community Development director for the Commission, and informed Dimit that he intended to build a factory that would employ about 150 people. After further discussions, Dimit informed Channapragada that the Commission would loan MSD $250,000 in Community Development Block Grant ("CDBG") money that the Department of Housing and Urban Development ("HUD") gives to the State Department of Commerce and Community Affairs, who then gives the grant to Champaign County.

The loan required Channapragada to provide at least $250,000 worth of collateral. In December, 1988, Channapragada offered a $550,000 piece of machinery to be manufactured in California as collateral. This proposal fell through, however, because MSD was unable to provide the Commission with a first security interest. After another unsuccessful attempt to secure a different piece of machinery as collateral, Channapragada offered electronic component parts supposedly owned by MTI and located in a factory in India. Unable to judge the value of the collateral, the Commission required the company to provide evidence of its value.

In an effort to provide this evidence, Channapragada created two invoices, one claiming the parts were worth $250,000 and another stating their value at $321,000. He manufactured these invoices by cutting and pasting from the original invoices for these parts; the original invoices indicated that these parts were obsolete and only worth $89,581. Channapragada sent to the Commission these fraudulent invoices and a letter asserting that his cost basis in the parts was $275,850.

In completing the loan documents, Channapragada signed a security agreement that falsely represented that MTI had the right to pledge the electronic parts "free and clear of all encumbrances." In fact, Channapragada had previously pledged to the Bank of India on December 1, 1986, in order to secure a $300,000 line of credit. MTI eventually defaulted on that loan and the Bank of India sued Channapragada and MTI in January, 1989. Channapragada filed his answer to this complaint on April 5, 1989. The Bank obtained a judgment on October 31, 1989.

Along with his problems in procuring adequate collateral for the Commission loan, Channapragada was unable to secure additional private financing for his project. As a result, the Commission decided to protect itself by using multiple loan closings and making several smaller loans. Channapragada closed on the first loan for $30,000 on April 7, 1989. Channapragada later borrowed $34,000 on May 24, 1989, another $30,000 on October 10, 1989, and $30,000 more on March 20, 1990. In each of the four transactions, Channapragada completed nearly identical paperwork, making the same representations that the collateral was worth approximately $321,000 and was owned free and clear of all encumbrances.

Ultimately, Channapragada never built the factory and defaulted on the Commission loans. Upon taking possession of the collateral, the Commission sold it and recovered only $4,500. Later, the Commission found the original undoctored invoice and discovered that the value of the equipment was far less than Channapragada had held it out to be. Excluding interest ($7,219.05) and attorney's fees ($38,764.33), the total actual loss to the Commission after selling the collateral was $111,793.18.

Channapragada was indicted and a jury convicted him of four counts of making fraud-

ulent and false statements, in violation of 18 U.S.C. § 1001, and four counts of counterfeiting and forgery, in violation of 18 U.S.C. § 495. In sentencing him under the United States Sentencing Guidelines ("U.S.S.G.") § 2F1.1, the district court set Channapragada's base offense at six. It added two levels for "more than minimal planning" based on a finding of "repeated acts" and enhanced the level by six based on a net loss to the victim of $111,793.18. The district court refused to give Channapragada credit for acceptance of responsibility, resulting in a total offense level of fourteen, and a sentencing range of fifteen to twenty-one months. The court then imposed on Channapragada a fifteen-month sentence and ordered him to pay restitution in the amount of $111,793.18. This appeal followed.

## II.

█ Channapragada raises two issues on this appeal. He first argues that he should not have received an upward adjustment for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2)(A). The guidelines define "more than minimal planning" to include "any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, application note 1(f) (referenced by U.S.S.G. § 2F1.1, application note 2); see United States v. Brown, 47 F.3d 198, 204–05 (7th Cir.1995); United States v. Doherty, 969 F.2d 425, 430 (7th Cir.), cert. denied, — U.S. —, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992). Channapragada contends that this enhancement is inapplicable because he did not commit "repeated acts." The crux of his argument is that he only misrepresented the value of the collateral on one occasion and that simply because the Commission chose to issue four separate small loans, instead of one large loan, he should not be held accountable for repeated acts. We review a district court's enhancement for more than minimal planning for clear error. United States v. Michalek, 54 F.3d 325 (7th Cir.1995); United States v. Mau, 45 F.3d 212, 214 (7th Cir.1995). We will reverse only if left "with a definite and firm conviction that a mistake has been com-

mitted." United States v. LeBlanc, 45 F.3d 192, 195 (7th Cir.1995).

While Channapragada is correct in pointing out that we generally require more than two acts to fall within this enhancement, see United States v. Maciaga, 965 F.2d 404, 407 (7th Cir.1992), the district court did not err in finding that he committed more than two acts. Specifically, the court found:

that there were at least four separate occasions on which the fraudulent false document was submitted. There was an occasion, in addition, on which the defendant directed the person to cut and paste together a document which would falsely represent the information contained in it; and then a sixth occasion on which the defendant presented the false information to the lending agency.

The record more than supports these findings and clearly reflects that on four separate occasions, Channapragada misrepresented the value of the collateral. On April 7, May 24, and October 10, 1989, and on March 20, 1990, Channapragada falsely stated that the collateral was worth $321,000 and was owned free and clear of any encumbrances, knowing both facts to be untrue. After the first loan closing, he did not attempt to rectify his misrepresentation; to the contrary, he repeated the lie a second, and a third, and a fourth time.

Despite this evidence, Channapragada maintains that he committed only one act of misrepresentation—the initial cutting and pasting of the invoice. He claims that it was not until the Commission decided to provide him with a series of smaller loans rather than one large loan that his fraud became "repeated acts." Channapragada insists that what the district court found to be four repeated acts were really only separate installments of a single loan and that he should not be punished because of the Commission's unilateral decision to break up the loan.

Channapragada's argument fails. The Commission apparently harbored a degree of skepticism about Channapragada's ability to procure adequate collateral. In its effort (albeit unsuccessful) to protect itself from being victimized, the Commission attempted to minimize its risk by making a series of

smaller loans and requiring proof of adequate collateral for each. On four separate occasions, Channapragada reacted to the precautions taken by the Commission by side-stepping this protective barrier. Simply because the splitting of the loan into four separate installments was not part of his original scheme does not shield Channapragada from this enhancement. The Guidelines do not require a sentencing court to treat a criminal who takes additional steps to overcome the defenses of the more sophisticated the same as one who more easily bests less worldly victims.

■ Second, Channapragada contends that the district court erred in adding six points to his base offense level under U.S.S.G. § 2F1.1(b)(1)(F) for the Commission's loss of $111,793.18. He argues that he pledged all of his assets as a personal guaranty for each of the four loans, and because he had acquired certain stock before sentencing, the value of the stock should have been deducted from the loss. He asserts that the district court erred in viewing the stock he owned as an "unrealized plan to repay," rather than as an asset securing the loan under his personal guaranty. Channapragada further maintains that the court failed to make proper findings concerning the value of the stock for purposes of calculating the net loss, relevant in light of the fact that he has now repaid $70,000 of the $111,000. Channapragada urges us to remand for a hearing so that he can show that he has repaid substantially all of the loan with proceeds generated through the sale of the stock. We review the district court's determination of the amount of loss for clear error, *United States v. Dillard*, 43 F.3d 299, 308 (7th Cir.1994), and review Channapragada's challenge to the meaning of "loss," a question of law, *de novo. United States v. Barrett*, 51 F.3d 86, 89 (7th Cir.1995); *Mau*, 45 F.3d at 215.

■ Section 2F1.1(b)(1)(G) provides for a six level increase in the base offense level for victim loss of more than $70,000. In fraudulent loan cases, loss is usually measured by the actual or intended loss. Specifically, § 2F1.1 directs that in fraudulent loan cases, actual loss to the victim should be used unless the intended loss is greater. U.S.S.G.

§ 2F1.1, application note 7(b); *United States v. Chevalier*, 1 F.3d 581, 585–86 (7th Cir. 1993) ("In calculating the amount of fraud, the district court was required to find 'the amount of money the victim has actually lost (estimated at the time of sentencing), not the potential loss as measured at the time of the crime. However, the "loss" should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than the actual loss.'") (quoting *United States v. Kopp*, 951 F.2d 521, 536 (3d Cir. 1991)). Elaborating on how to determine the loss, application note 7 to § 2F1.1 explains:

> In fraudulent loan application cases … the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.

*Cf. Mau*, 45 F.3d at 216 ("when calculating 'intended' loss in a fraudulent loan case, the amount of the loan can only be offset by the value of the collateral the [lender] has or expects to gain at the time the fraud is discovered").

■ Using the language of the application note as our starting point, we note that Channapragada had not repaid any of the loan at the time the offense was discovered. We then look to the amount that the Commission had recovered by sentencing or could expect to recover from any assets pledged to secure the loan. Channapragada argues that because he had personally guaranteed his assets as security for the loans, the Commission could have expected to recover the value of the stock. Channapragada argues that *United States v. Mount*, 966 F.2d 262, 266 (7th Cir.1992), allows a loss offset for money where "the victim has access to a ready source of compensation." He contends that the existence of a trust that controls his stock, and the possible presence of a buyer of the stock was enough to qualify it as such as "ready source" of compensation. The district court disagreed, however, and found

that the liquidity of the stock was too speculative and illusory.

 In light of the record, we hold that the court did not clearly err in calculating the Commission's loss and determining that the stock was not a "ready source" of income. The evidence presented to the district court at the sentencing hearing reflected that the stock was potentially unmarketable, with little, if any, net worth. Furthermore, we have previously held that "unrealized plans to repay do not reduce the loss amount." *United States v. Holiusa*, 13 F.3d 1043, 1046 (7th Cir.1994). Given Channapragada's (lack of) efforts to repay the loss to that point, and the uncertainty of his future success in doing so, the district court reasonably found Channapragada's stock strategy was merely an "unrealized plan" and should not be offset against the Commission's loss.

For the foregoing reasons, the district court's sentencing is AFFIRMED.