**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Darren GREEN, Demetrius Lardydell, Adrienne Williams, Dirk Green, and Governor Earl Warren, Defendants–Appellants.**

Nos. 95–3235, 95–4050, 96–1057, 96–1729, 96–2545 and 96–2558.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1996.

Decided May 19, 1997.

Philip P. Simon (argued), Office of United States Attorney, Hammond, IN, for Plaintiff-Appellee in Nos. 95-3235, 95-4050, 96-2558.

Jon E. DeGuilio, Office of the United States Attorney, Dyer, IN, Philip P. Simon (argued), Office of United States Attorney, Hammond, IN, for Plaintiff-Appellee in Nos. 96-1057, 96-1729.

Andrew B. Baker, Jr., Office of United States Attorney, Dyer, IN, Philip P. Simon (argued), Office of United States Attorney General, Hammond, IN, for Plaintiff-Appellee in No. 96-2545.

Karen M. Freeman-Wilson (argued), Gary, IN, for Defendant-Appellant in No. 95-3235.

Joseph B. Cioe, Jr., Valparaiso, IN, for Defendant-Appellant in No. 95-4050.

Allen E. Shoenberger, Isabel Kowalewski (Law Student, argued), Chicago, IL, for Defendant-Appellant in No. 96-1057.

Daniel L. Toomey (argued), Merrillville, IN, for Defendant-Appellant in No. 96-1729.

Jerry L. Peteet (argued), Gary, IN, for Defendant-Appellant in Nos. 96-2545, 96-2558.

Before BAUER, FLAUM, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Automobile accidents have been an unfortunately common occurrence ever since the invention of the car, and, equally regrettably, they often give rise to both personal injuries and significant property damage. Everett Warren saw the opportunity to skim money from insurance companies in these basic facts: stage phony accidents, exploit the medical profession so that fraudulent insurance claims could be filed, and pocket the money. This is not the first time we have seen his handiwork. See *United States v. Boatner*, 99 F.3d 831 (7th Cir.1996). These consolidated appeals present the claims of Darren Green, Demetrius Lardydell, Adrienne Williams, Dirk Green, and Governor Earl Warren (which, as far as we can tell, is his real name) from their convictions and sentences on counts relating to mail fraud and conspiracy to commit mail fraud. Williams challenges both her conviction and her sentence, while the other four appellants raise only Sentencing Guidelines arguments before this court. After reviewing the entire record, we affirm the judgments in the cases of Darren Green, Demetrius Lardydell, Adrienne Williams and Dirk Green. We dismiss the appeals of Governor Earl Warren.

Everett Warren, who pleaded guilty to two counts of mail fraud in a separate proceeding, was clearly the mastermind behind the "accidents" at issue here. On April 26, 1989, Everett invited Dirk and Darren, along with Darren's wife Lisa and their child, to participate in a staged accident. They agreed, whereupon Everett took Lisa's 1984 BMW (on which she had uninsured motorist coverage) and backed it into a steel post, causing damage to the car. He then gathered up the debris, and drove with Darren, Dirk, Lisa, and the child to Gary, Indiana. Once there, Everett arranged the damaged BMW near a stop sign and the Greens climbed in; Everett carefully spread the debris behind the car and called the police.

The Greens informed the officer who responded that their car had been struck by a

hit-and-run driver. They feigned injuries and wound up in the emergency room of a local hospital, where they were treated for nonexistent injuries. In the weeks that followed, the Greens made repeated trips to a doctor (who may not have been part of the conspiracy), which had the effect of inflating the medical bills upon which they could then base a settlement demand. Darren then retained a lawyer who filed a claim against the company that had written the uninsured motorist policy for the BMW. The company paid a total of $36,655 to settle the claim, of which Darren kept $11,500.

The next staged accident occurred quite some time later, on February 21, 1993. This time Everett used his own car and had Lardydell and three other persons pose as the injured passengers. The *modus operandi* was similar to the 1989 scheme. After being "treated" both in the emergency room and by a doctor for his phony injuries, Lardydell retained attorney Richard Levinson to file a claim with Allstate, which had insured Everett's car. Levinson and Everett had a standing arrangement under which Everett directed automobile accident victims (sometimes *bona fide*) to Levinson, and Everett received a fee for his "finder" services that depended on the amount eventually recovered from the insurance company. For the Lardydell incident, Allstate placed $40,000 in reserve, but it never paid on the claim because the FBI discovered the fraudulent scheme in time to alert the company.

In addition to these two accidents, Everett oversaw the staging of at least seven others, including one where Governor Earl posed as one of the injured. Everett sent Governor Earl to Adrienne Williams at the Lakeside Medical Clinic. Williams, a nurse at the Clinic, already had a working relationship with Everett. For a referral fee of $100 per patient, she referred accident victims to Everett, who would then send them along to Levinson. When Governor Earl showed up, Williams told him that he would have to see the doctor once, but that she would then "take care" of everything else. This turned out to mean that she would oversee the creation of a fraudulent bill from Lakeside, which stated that Governor Earl had been to the Clinic a whopping 41 times. That bill was then used to obtain settlements from insurance companies. Others whom Everett had sent to Williams received similarly false billing statements, which were used in the same way. Among them were two undercover postal inspectors, who participated in Everett's phony accidents and were referred to Lakeside. Although neither one of them received any therapy at the Clinic and had not stepped foot inside it more than three times, one received a bill showing 25 visits for therapy and the other a bill showing 26 such visits.

The scheme eventually unraveled, and on October 20, 1994, the grand jury handed down an indictment charging these appellants and 23 others with mail fraud and conspiracy to commit mail fraud, in violation of 18 U.S.C. secs. 371 and 1341. Darren Green pleaded guilty to two counts of mail fraud; he was sentenced to four months' imprisonment and four months' home detention and was ordered to pay $11,500 in restitution. Lardydell went to trial on one count of conspiracy to commit mail fraud and four counts of mail fraud and was found guilty by the jury on all charges; he received a sentence of 22 months' imprisonment. Williams also chose to go to trial on charges of conspiracy to commit mail fraud and 16 counts of mail fraud. After three of the substantive counts were dismissed, the jury found her guilty on the conspiracy count and five counts of mail fraud; she was acquitted on eight more counts of mail fraud. She was sentenced to 14 months' imprisonment and ordered to pay $10,993 in restitution. Dirk Green chose the guilty plea route; for the two counts of mail fraud to which he pleaded guilty, he received 15 months' imprisonment and an obligation to pay $6,000 in restitution. Last, Governor Earl Warren pleaded guilty to two counts of mail fraud. When the time came for sentencing, however, he failed to appear. Later, he was arrested on a bench warrant, charged with failure to appear (to which he also pleaded guilty), and received a consolidated sentence for the original offense and the failure to appear of 12 months' imprisonment.

Although these cases have been consolidated throughout because of their common factual basis, the arguments each appellant makes before this court are distinct enough that we find it more convenient to discuss their appeals individually. All but Williams complain only about their sentences, while she attacks her convictions as well. We therefore begin with her appeal, and then turn to the other four.

### 1. *Adrienne Williams*, No. 96–1057

■ Williams offers two reasons why her conviction should be set aside: first, she claims that the court should not have permitted the introduction of evidence relating to her receipt of referral fees from Everett, and second, she claims that her right to a fair trial was violated when jury instruction no. 8 incorporated the entire indictment, including the counts that had already been dismissed against her. At the outset, she faces substantial procedural problems with both these arguments. She did not object to the introduction of the referral fee evidence at trial, which means that this court can review the issue only for plain error. *United States v. White*, 903 F.2d 457, 466 (7th Cir.1990); *United States v. Newman*, 965 F.2d 206, 213 (7th Cir.1992). With respect to the jury instruction claim, she argued at trial only that language from the counts dismissed against her "cannot be a part of the indictment presented to the jury, because it's not part of the indictment any more." She did not in any way indicate that her objection was based on the due process clause and was thus of constitutional dimension. Federal Rule of Criminal Procedure 30 requires a party to "stat[e] distinctly the matter to which the party objects and the grounds of the objection." As we said in *United States v. Martinez*, 988 F.2d 685, 698 (7th Cir.1993), an objection "must identify what, particularly, is wrong, and why: nothing else alerts the judge to what is at stake." Because Williams' objection failed to identify her due process argument, we must also review this point under the demanding plain error standard.

We see nothing so fundamentally wrong in either of the district court's rulings that would lead to a miscarriage of justice if left uncorrected. Williams first points out that one of the counts dismissed against her was a claim that she had received money to fabricate medical bills. The testimony about the referral fees she received from Everett Warren, she argues, could have been relevant only to this dismissed count, not to any issue that remained in the case. By allowing the jury to consider this testimony, and then, worse, by allowing the jury to see the full indictment, she asserts that the jury could have drawn impermissible inferences from the testimony. Although we do not disagree that there might have been some such risk, Williams is wrong to argue that the referral evidence was not relevant to other issues in the case. As the government points out, it helped to show that Everett and Williams had a close working relationship, which in turn helped to prove the conspiracy count against Williams. This would have been a perfectly legitimate use of the referral fee evidence. Williams has shown nothing here other than her speculation that the jury verdict might have been tainted by the evidence, coupled with the copy of the full indictment in instruction no. 8. Had she objected at trial, the court could have handled any possible problem with a curative instruction. At this stage, however, her speculation is not enough to prove that either the referral evidence or the full indictment made a difference in the judgment.

■ Williams also raises one point about her sentence. She claims that the district court erred in calculating the loss attributable to her for purposes of U.S.S.G. § 2F1.1. Once again, she failed to raise any objection to the specific loss calculation before the district court, even though the presentence report set forth the calculations she now challenges. Our examination is therefore again limited to a consideration of plain error.

■ The calculation of loss under § 2F1.1 is a finding of fact, which we would review only for clear error under the best of circumstances. *United States v. Holiusa*, 13 F.3d 1043, 1045 (7th Cir.1994). That section begins with a base offense level of 6, and then sets forth increases based on the

amount of loss involved in the offense. Loss is defined as "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, application note 7. All direct damages are to be included in the loss calculation, but consequential or incidental damages are not to be counted as damages for loss calculation purposes. *United States v. Marlatt*, 24 F.3d 1005, 1007–08 (7th Cir.1994).

Using this framework, the district court included both the amount of the medical bills from the Lakeside Medical Clinic ($13,858) as well as the amounts above that sum that the various insurance companies who were the target of the fraudulent scheme paid out, for a total of $46,840. Williams argues that only the amount of the medical bills should have been attributed to her, because the insurance company payments included bills from other medical providers, as well as payments for property damages and loss of wages—all of which Williams argues were consequential or incidental damages. Testimony at the sentencing hearing, however, indicated that a great part of the $46,840 was based upon the fraudulent Lakeside bills. Attorney Levinson, who had pleaded guilty to his own role in the insurance fraud, testified that insurance companies usually pay 3–4 times the amount of a victim's medical bills to settle a claim. Two insurance adjusters testified to the same effect, that medical bills were used as the starting point for settlements and did not represent the full amount that a company would pay. Furthermore, the "victims'" claims for lost wages were made believable by the existence of the fraudulent Lakeside bills, which made it more likely that the insurance companies would include lost wage payments in their settlement offers. The district court did not clearly err—much less commit plain error—in concluding that the full amount of the insurance company payments were direct damages caused by Williams' fraud, and thus "loss" for purposes of § 2F1.1.

### 2. *Darren Green*, No. 95–3235

In sentencing Darren Green, the district court found that his fraudulent activities involved more than minimal planning, for purposes of U.S.S.G. § 2F1.1(b)(2), and that he

was not a minor participant in the scheme for purposes of U.S.S.G. § 3B1.2(b). We review both these determinations under the clear error standard. See *United States v. Moore*, 991 F.2d 409, 411 (7th Cir.1993) (more than minimal planning); *United States v. Gunning*, 984 F.2d 1476, 1484 (7th Cir.1993) (minor participant).

■ Section 2F1.1(b)(2) provides that a defendant's offense level should be increased by two if the offense involved more than minimal planning. The Guideline provides three alternative ways in which that might be shown: (1) more planning than is typical for commission of the offense in a simple form, (2) significant affirmative steps taken to conceal the offense, or (3) repeated acts over a period of time, unless it is clear that each instance was purely opportune. See U.S.S.G. § 1B1.1, application note 1(f); *United States v. Lewis*, 41 F.3d 1209, 1213 (7th Cir.1994) (enhancement proper if any one of the three factors exists). In Darren Green's case, the court found that both the second and the third factor supported the enhancement. In our view, the enhancement would have been proper under any of the factors; we therefore see no error, clear or otherwise, in the district court's conclusions.

The staged automobile accident and the elaborate follow-up with medical providers and insurance companies in which Darren played a part required far more planning than would be typical for a simple fraud, such as mere inflation of a claim after an actual accident. It makes no difference that Darren himself may not have been involved in the pre-accident planning, because the Guideline focuses "on the planning involved in the offense rather than on the planning done by the particular offender." *United States v. Levinson*, 56 F.3d 780, 781 (7th Cir.1995). As this was a conspiracy case, Darren may also be held accountable for the foreseeable conduct of his accomplices, under § 1B1.3(a)(1)(B). *Id.* at 782. It would have been clear to Darren at the time he agreed to participate in Everett's scheme that pre-planning had already taken place. Finally, at the change of plea hearing Darren answered "yes" when he was asked whether he "[got] together with all these individuals and

plan[ned] to have a staged accident so that you could make a phony claim." He also admitted that he and others had gotten together "and planned this scheme to defraud and then worked it, trying to make it succeed."

■ The district court's findings that Darren took significant affirmative steps to conceal the offense and that he engaged in repeated acts over time (that were not "purely opportune") are also well supported by the evidence. He made some 15 visits to physicians, which assisted in concealing the fraud and substantiating the bogus personal injury claim. Darren argues that because these visits were part of a single scheme to defraud, there could not have been repeated acts within that scheme for purposes of § 2F1.1(b)(2). He is wrong. Nothing in § 2F1.1(b)(2) calls for entirely separate fraudulent schemes. When the individual acts that make up a single fraudulent scheme are repetitive—one consistent way of carrying out a fraudulent plan—the enhancement is proper. Each visit to a physician, furthermore, gave a patina of respectability to the case presented to the insurance companies, and thus was an affirmative step taken to conceal the fraud. The enhancement for more than minimal planning was plainly appropriate for Darren Green's case.

■ Darren's argument that he should have been treated as a minor participant for purposes of U.S.S.G. § 3B1.2(b) also fails on the facts. Minor participants, as the term is defined in the Guidelines, are entitled to a two-level downward reduction in offense level. In order to qualify, Darren would have had to show that he was "substantially less culpable" than the average defendant. See *Gunning*, 984 F.2d at 1484 (quoting *United States v. Navarez*, 954 F.2d 1375, 1382 (7th Cir.1992)); U.S.S.G. § 3B1.2, application note 3. His argument before both the district court and this court is simply that the fraud could have continued without him, which indicates to him that he did not play an "integral role" relative to his co-defendants. Unfortunately, that is not the proper legal test. The district court's finding that his role in the fraud, which included multiple visits to the doctor and the filing of a fraudulent claim,

made him no less culpable than his codefendants, was not clearly erroneous.

### 3. *Demetrius Lardydell,* No. 95–4050

■ Lardydell complains only about the district court's finding that he obstructed justice, which led to a two-level increase in his offense level under U.S.S.G. § 3C1.1. The district court expressly found that Lardydell committed perjury when he took the stand at trial and testified that the "accident" that occurred on February 21, 1993, was real. At the sentencing hearing, the judge stated:

> ... I find that the testimony of the defendant was totally unbelievable, incredible, and the Court further finds that the defendant did, in fact, perjure himself. And by doing so, did, in fact, obstruct justice.

In light of this language, Lardydell's argument that the court failed to make a clear finding on perjury is hard to fathom. Judge Lozano's statement easily satisfied the requirement that a judge applying the obstruction enhancement on the basis of perjury "independently determine" whether the perjury occurred. *United States v. Lozoya–Morales*, 931 F.2d 1216, 1219 (7th Cir.1991). Lardydell's other challenge to the enhancement boils down to the argument that we should re-weigh the credibility of the witnesses whose testimony contradicted Lardydell's. Credibility choices, however, are for the district court; its choice among competing witnesses will almost never be clearly erroneous. *United States v. Robinson*, 14 F.3d 1200, 1204 (7th Cir.1994).

### 4. *Dirk Green,* No. 96–1729

■ The district court also enhanced Dirk Green's sentence two levels for obstruction of justice, based on his failure to appear for a sentencing hearing that had been scheduled for September 27, 1995. See U.S.S.G. § 3C1.1, application note 3(e), noting that the enhancement is justified for "willfully failing to appear, as ordered, for a judicial hearing." The evidence before the court showed that the presentence report, which Dirk acknowledged receiving, listed the hearing date on its front page. Dirk's rather feeble response was that he "must have overlooked" the date, although he of-

fered no reason why he might have done so. The only other notification came from a telephone call Dirk's attorney placed to Dirk's mother's home on September 26, 1995. Dirk, however, was not living with his mother at the time and did not learn of the call until 9:00 a.m. on September 27, the morning of the hearing.

Based on this evidence, the district court concluded that Dirk's failure to appear was "willful." Dirk argues that it could not have been willful, because he was not aware of the order at all and thus could not have disobeyed it intentionally. This argument amounts, once again, to an attack on the district court's credibility determinations. The court concluded that Dirk's acknowledged receipt of the presentence report, which clearly showed the hearing date, meant that he did know when the hearing was scheduled. The court also considered the fact that Dirk had missed other hearing dates in the past. Like the other sentencing claims we have considered here, this is subject to clear error review, and we see nothing that comes close to suggesting that the district court's determinations should be set aside.

### 5. *Governor Earl Warren*, Nos. 96–2545 and 96–2558

 Governor Earl Warren appears to argue that the district court erred when it did not depart downward on the basis of mitigating circumstances in his case. His brief's argument section is less than one page long and does not develop the point adequately to preserve it for appellate review. *John v. Barron*, 897 F.2d 1387, 1393 (7th Cir.1990). Furthermore, we have no jurisdiction to review a district court's discretionary decision to depart from the Guidelines, as long as it is clear that the district court knows it has such discretion. *United States v. Gaines*, 7 F.3d 101, 105 (7th Cir.1993). We thus do not review his unsupported claim that the lack of a downward departure in his case violated the Eighth Amendment of the United States Constitution. He has also failed to develop any argument in his appeal from the failure to appear conviction with enough clarity to permit appellate review (indeed, although he appears to be challeng-

ing only the sentence in this case, this is just a guess on our part). This leaves us with no choice but to dismiss Governor Earl Warren's two appeals, as we cannot discern any cognizable claims he is raising, much less consider what merit they may have.

In summary, we AFFIRM the judgment in Adrienne Williams' case, No. 96–1057, and we AFFIRM the sentences imposed on Darren Green, Demetrius Lardydell, and Dirk Green, Nos. 95–3235, 95–4050, 96–1729. We DISMISS Governor Earl Warren's two appeals, Nos. 96–2545 and 96–2558.